## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TWIN CITY FIRE INSURANCE CO., | |
| Plaintiff, | |
| v. | Civil Action No: |
| GLENN O. HAWBAKER, INC., | |
| Defendant. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Twin City Fire Insurance Co. ("Twin City"), for its Complaint against Defendant Glenn O. Hawbaker, Inc. ("Hawbaker"), avers as follows:

## I.  INTRODUCTION

1.  This is an insurance coverage dispute in which Twin City seeks a declaration that there is no insurance coverage for any defense costs or indemnity in connection with Hawbaker's defense, settlement, or liability arising out of three underlying lawsuits – one criminal, the other two civil class actions – filed against Hawbaker for theft and misuse of over $20 million in wage benefits.

2.  Twin City issued Private Choice Premier Policy No. 83 KB 0349589-21, effective for the period of April 1, 2021 to April 1, 2022 (the "2021 Policy".) A copy of the 2021 Policy is attached hereto as Exhibit "A."

3.     In June 2018, years prior to the effective date of the 2021 Policy, the Commonwealth of Pennsylvania conducted a criminal investigation of Hawbaker's wage benefits practices. In April 2021, the Commonwealth filed a criminal complaint against Hawbaker, styled *Commonwealth of Pennsylvania v. Glenn O. Hawbaker, Inc.*, Docket No. CR-89-2021, alleging that Hawbaker "stole $20,696,453 in fringe benefit funds from prevailing wage workers between September 1, 2015 and December 31, 2018 and used that money to pay for all [Hawbaker] benefits and otherwise to lower the company's costs." Hawbaker resolved the criminal action by plea agreement, agreeing to, among other things, pay over $20 million in restitution.

4.     Victims of Hawbaker's theft then filed two civil class actions against Hawbaker, styled *James C. King v. Glenn O. Hawbaker, Inc.*, Case No. 2021-957, currently pending in the Pennsylvania Court of Common Pleas, Centre County (the "King Class Action"), and *Lester Packer, Sr. v. Glenn O. Hawbaker, Inc.,* Case No. 21-cv-01747, currently pending in the Middle District of Pennsylvania (the "Packer Class Action".) (The Hawbaker "Board of Directors," the Plan Administrator of the Hawbaker Benefit Plan, and John Does 1-20 are also named defendants in the Packer Class Action.)

5.     The two civil actions seek, among other things, restitution relating to Hawbaker's theft and misuse of funds it diverted during the period of 2015 to 2018.

6.      Hawbaker provided Twin City with notice of each lawsuit and requested insurance coverage under the 2021 Policy. Twin City denied coverage for these lawsuits for multiple reasons, including without limitation because the 2021 Policy does not provide coverage for, among other things, (a) a loss that was not fortuitous or that was in progress or known prior to the Policy's inception date; (b) restitution; or (c) other than certain defense costs, the actual or alleged failure to pay or fund an Insured Plan. Twin City also explained that certain representations made by Hawbaker in its application for the 2021 Policy and the prior year's policy (the "2020 Policy") appeared to be false in light of the longstanding criminal investigation such that there was no coverage under the policy.

7.      Hawbaker continues to assert that Twin City must provide Hawbaker with insurance coverage for the three lawsuits under the 2021 Policy.

8.      Accordingly, Twin City brings this action to protect its rights and to obtain a declaration that there is no coverage for any of the three lawsuits.

## II.    PARTIES, JURISDICTION, AND VENUE

9.      Twin City is a corporation organized under the laws of the State of Indiana with its principal place of business in Hartford, Connecticut. Twin City is an insurance company.

10.    Hawbaker is a Pennsylvania corporation with its principal place of business in State College, Pennsylvania. Hawbaker is a paving and construction company.

11.    This Court has jurisdiction pursuant to 28 U.S.C. to § 1332(a)(1) because the controversy is between citizens of different states and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interests and costs.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Hawbaker is deemed to reside in this district, the ERISA Plan at issue in one or more of the underlying actions is administered in this district, and the underlying actions were initiated in this district.

## III.    <u>BACKGROUND</u>

### A.    <u>The 2021 Policy</u>

13.    The 2021 Policy is a claims-made policy, which contains, among other things, a Fiduciary Liability Coverage Part, subject to a $4 million aggregate limit and no retention, and an Employment Practices Liability Coverage Part, which is subject to a $3 million aggregate limit and a $150,000 retention. Ex. A. at Declarations.

- 4 -

14.     Under the terms of 2021 Policy, coverage is provided on a claims-made basis, and, as a condition of coverage, a Claim against an Insured must be first made during the Policy Period.  Ex. A. at Common Terms and Conditions.

15.     The 2021 Policy's insuring clause relating to the Fiduciary Liability Coverage Part provides in part as follows:

> (A) Fiduciary Liability
>
> The Insurer shall pay Loss on behalf of the Insureds resulting from a Fiduciary Claim first made against the Insureds:
>
> (1) during the Policy Period or Extended Reporting Period, if applicable, for a Wrongful Act by the Insureds or by any person for whose Wrongful Acts the Insureds are legally responsible . . .

(Ex. A., Fiduciary Liability Coverage Part § I (A).)

16.     "Loss" is defined as certain defense costs and other amounts "that the Insureds are legally liable to pay solely as a result of a Claim covered by this Liability Coverage Part[.]" (Ex. A., Fiduciary Liability Coverage Part § II.)

17.     "Fiduciary Claim" is defined to include a:

> (4) formal administrative or regulatory proceeding commenced by the filing or service of a notice of charges, formal investigative order or similar document, including an investigation by the Department of Labor or Pension Benefit Guaranty Corporation or any governmental authority equivalent that is located outside of the United States (including the Pensions Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or

by the United Kingdom Occupational Pensions Regulatory Authority or any successor thereto); . . . .

(6) investigation of an Insured Person for a Wrongful Act committed in his or her capacity as a fiduciary of an Insured Plan, commenced by such Insured Person's receipt of a written document identifying him or her as the target of an investigation, including a Wells Notice, target letter or search warrant, but only if received from any governmental authority other than the Department of Labor, Pension Benefit Guaranty Corporation or any governmental authority equivalent thereto that is located outside of the United States (including the Pensions Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or by the United Kingdom Occupational Pensions Regulatory Authority or any successor thereto);

(7) written request upon an Insured Person for witness testimony or document production commenced by the service of a subpoena or similar document which compels such testimony or the production of documents in connection with any matter described in sub-paragraphs (1) through (4) above . . . .

(*Id.*)

18.    "Wrongful Act" is defined under the 2021 Policy Fiduciary Liability

Coverage Part as any actual or alleged:

(1) error, misstatement, misleading statement, act, omission, neglect or breach of duty constituting a violation of any responsibilities, obligations or duties imposed upon fiduciaries of an Insured Plan by ERISA or any similar law; . . .

(3) error, misstatement, misleading statement, act, omission, neglect or breach of duty in the selection or oversight of any provider of Managed Care Benefits or any similar organization;

- 6 -

(4) error, misstatement, misleading statement, act, omission, neglect or breach of duty in counseling, providing interpretations, handling records, or effecting enrollment, termination or cancellation of Employees, participants, or beneficiaries under an Insured Plan; or in the administration of an Insured Plan;

(5) act, error or omission by an Insured in their settlor capacity with respect to the creation, termination or amendment of an Insured Plan, including but not limited to any wellness program or plan which is subject to ERISA; or

(6) matter claimed against an Insured due to such Insured acting in the capacity of a fiduciary of an Insured Plan.

(*Id.*)

19.    "Insured Plan" is defined to include any past, present, or future:

(1) employee welfare benefit plan or employee pension benefit plan, as defined in ERISA, or plans as defined by similar applicable foreign laws and regulations, sponsored solely by an Insured Entity, or jointly by an Insured Entity and a labor organization, for the benefit of Insured Persons only; . . . or

(5) any other plan, fund, or program specifically included as an Insured Plan in a written endorsement issued by the Insurer to form a part of this Policy.

(*Id.*)

20.    The 2021 Policy also contains an Employment Practices Liability

Coverage Part, which states as follows:

(A)    Employment Practices Liability

The Insurer shall pay Loss on behalf of the Insureds resulting from an Employment Practices Claim first made against the Insureds during the Policy Period or Extended Reporting Period,

if applicable, for an Employment Practices Wrongful Act by the Insureds.

(B)   Third Party Liability (Elective)

If Third Party Liability Coverage is included in ITEM 5 of the Declarations, the Insurer shall pay Loss on behalf of the Insureds resulting from a Third Party Claim first made against the Insureds during the Policy Period or the Extended Reporting Period, if applicable, for a Third Party Wrongful Act by the Insureds.

(Ex. A., Employment Practices Liability Coverage Part § I (A).)

21.   "Employment Practices Claim" means any of the following if made by or on behalf of an Employee, an applicant for employment with an Insured Entity, or an Independent Contractor:

(1) a written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand, including, without limitation, a written demand for employment reinstatement;

(2) a civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

(3) a formal administrative or regulatory proceeding, including, without limitation, a proceeding before the Equal Employment Opportunity Commission or similar governmental agency, commenced by the Insured's receipt of a notice of charges, formal investigative order or similar document, or by the Insured's having evidence of a filing related thereto; or

(4) a criminal proceeding commenced by the return of an indictment or similar document. . . .

(*Id.*)

22.    "Third Party Claim" means:

> (1) a written demand for monetary damages or other civil non-monetary relief commenced by the receipt of such demand;

> (2) a civil proceeding, including an arbitration or other alternative dispute resolution proceeding, commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading; or

> (3) formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document . . .

(*Id*.)

23.    "Employment Practices Wrongful Act" is defined to include:

> (5) breach of any oral, written, or implied employment contract, including, without limitation, any obligation arising from a personnel manual, employee handbook, or policy statement; . . .

(*Id*.)

24.    The coverage provided under the Employment Practices Coverage Part is subject to the following exclusions:

> (B) The Insurer shall not pay Loss in connection with any Claim based upon, arising from, or in any way related to:

> (1) any claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or social security benefits;

> (2) any actual or alleged violation of the Worker Adjustment and Retraining Notification Act, the National Labor Relations Act, the Occupational Safety and Health

Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, ERISA, or any similar law; or

(3) any Wage and Hour Violation. ***

(C) The Insurer shall not pay Loss in connection with any Claim based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, that this exclusion shall not apply to liability that would have been incurred in the absence of such contract nor shall it apply to the portion of the Loss representing Defense Costs incurred to defend against such liability.

(Ex. A, Employment Practices Liability Coverage Part § III (B) (1), (2), and (3) and § III (C).)

25.    The coverage provided under both the Fiduciary Liability Coverage Part and the Employment Practices Coverage Part is subject to certain other exclusions, including the following:

(A) The Insurer shall not pay Loss: . . .

(6) in connection with any Claim based upon, arising from, or in any way related to any:

(a) claims for unpaid wages (including overtime pay), workers' compensation benefits, unemployment compensation, disability benefits, or . . .

(c) a Wage and Hour Violation.

(7) of an Insured, based upon, arising from, or in any way related to the gaining of any personal profit, remuneration or financial advantage to which such Insured is not legally entitled if a judgment or other non-appealable final adjudication in the underlying action establishes that such a gain did occur; or

- 10 -

(8) of an Insured, based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission or any willful violation of law by such Insured if a judgment or other non-appealable final adjudication in the underlying action establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to Insured Entities if a past or present chief executive officer, chief financial officer general counsel or any position equivalent to the foregoing of the Named Entity committed such an act, omission or willful violation.

(B) Other than that portion of Loss that represents Defense Costs incurred to defend the following allegations or demands, the Insurer shall not pay Loss for any Claim:

(1) for the actual or alleged failure to pay benefits pursuant to any Insured Plan, provided that this exclusion shall not apply to the extent that:

(a) recovery of such benefits is based upon a covered Wrongful Act and is payable as a personal obligation of an Insured Person; or

(b) a Claim made against any Insured alleges a loss to an Insured Plan and/or to the accounts of such Insured Plan's participants by reason of a change in value of the investments held by such Insured Plan, regardless of whether the amounts sought in such Claim are characterized by plaintiffs or held by a court to be benefits due or damages for breach of fiduciary duty;

(2) based upon, arising from, or in any way related to the actual or alleged failure to fund, or collect contributions owed to, an Insured Plan; or

(3) for return or reversion of any contributions or assets to an Insured Entity from an Insured Plan.

(Ex. A, Fiduciary Liability Coverage Part § III (A) (6), (7), and (8) and (B) (1), (2), and (3).)

26.     Under the terms of the 2021 Policy, all Claims based upon, arising from, or in any way related to the same Wrongful Acts or Interrelated Wrongful Acts shall be deemed to be a single Claim for all purposes under the Policy first made on the earliest date that any of the Claims was first made, regardless of whether such date is before or during the Policy Period. (Ex. A, Common Terms and Conditions § X.)

27.     Section XVI, Application, of the 2021 Policy provides that:

(B)     If the **Application** contains intentional misrepresentations that materially affect the acceptance of the risk by the Insurer:

(1) for the purposes of determining coverage under all Coverage Parts other than the Directors, Officers and Entity Liability Coverage Part, no coverage shall be afforded under this Policy for any **Insureds** who knew on the Inception Date of this Policy of the facts that were so misrepresented, provided that:

(a) knowledge possessed by any **Insured Person** shall not be imputed to any other Insured Person; and

(b) knowledge possessed by any chief executive officer, general counsel, chief financial officer, human resources director or any position equivalent to the foregoing of the **Named Entity**, or anyone signing the **Application**, shall be imputed to all **Insured Entities**. No other person's knowledge shall be imputed to an **Insured Entity.**

**B. Hawbaker's Knowledge of the Investigation and Its Wage Benefit Conduct**

28.     In June 2018, the Commonwealth executed a Search Warrant against Hawbaker, seeking, among other things, (a) plan/trust documents for all benefit plans; (b) summary plan descriptions; (c) notices sent to employees pertaining to all benefit plans; (d) schedule of plan participants and status; (e) correspondence with plan administrators; (f) annual audit reports of all benefit plans; (g) records for all employees, whether working prevailing wage or non-prevailing wage, of benefits provided and contribution rates for each; (h) documentation of all plan payments and plan costs; (i) complaints submitted by any employee regarding the payment or allocation of prevailing wage fringe benefit funds; and (j) correspondences received from the U.S. Department of Labor or the PA Department of Labor and Industry regarding complaints, investigation, or litigation related to the payment of prevailing wage fringe benefits. A copy of the Search Warrant, with Affidavit of Probable Cause is attached as Exhibit B.

29.     Each category of documents sought relates directly to Hawbaker's administration of an Insured Plan and wage benefits practices.

30.     The Affidavit of Probable Cause supporting the Search Warrant confirms that: (1) Hawbaker is being targeted for investigation because of various allegations of theft, corruption, and related offenses; (2) Hawbaker allegedly knowingly and intentionally falsely overstated what it paid to its employees in fringe

benefits in order to deprive employees of a portion of their wages; (3) Hawbaker allegedly stole a portion of its employees' wages, thereby committing theft by unlawful taking, theft by failure to make required disposition of funds received, tampering with public records, and false swearing; (4) Hawbaker allegedly did not make pension contributions in the manner in which it claimed to; (5) several Hawbaker employees never received fringe benefits that they were entitled to receive from Hawbaker; and (6) Hawbaker knowingly overstated in its wage certifications that it is spending certain amounts of money to pay for its prevailing wage employees' health, welfare, and pension plans, but then off-sets the hourly cash wages paid through submission of false, overstated fringe benefit figures. (Ex. B.)

31.    In June of 2019, Hawbaker retained a consultant and subsequently changed the way that it handled payment of prevailing wage fringe benefit funds and ERISA Plan.

32.    Upon information and belief, Hawbaker was aware by no later than June 2019 (and likely earlier) that it was the target of an investigation related to malfeasance around the administration of its Insured Plan and that its wage benefit practices were improper and reasonably likely to lead to a Claim being asserted against it.

33.    Yet, in connection with its application for the 2020 Policy, Hawbaker answered "yes" to the following question: "Are all plans in compliance with plan agreements and ERISA?" and "no" to the following question: "During the past 24 months, has there been, or is there currently, any investigation by the IRS, DOL . . . or any other State or Federal Agency of any employee benefit plan or any current or former fiduciary of such employee plan?"

34.    Upon information and belief, at the time it submitted the 2020 Policy application, Hawbaker was aware or should have reasonably been aware that (a) its administration of the Insured Plan and its wage benefits practices were improper and could reasonably lead to a Claim being asserted against it; and (b) its answers to the questions above in the 2020 Policy application were false.

35.    In connection with its application for the 2021 Policy, Hawbaker answered "no" to the following question: "Does an applicant . . . have any knowledge or information of any error, misstatement, misleading statement, act, omission, neglect, breach of duty or other matter that may give rise to a claim?"

36.    According to the Commonwealth of Pennsylvania, prior to April 8, 2021, Hawbaker officers had already admitted that the company had improperly used prevailing wage benefit funds to pay for general employees, executives, and owners benefits.

37.     Upon information and belief, at the time it submitted its 2021 Policy application, Hawbaker was aware or should have reasonably been aware that (a) its administration of the Insured Plan and its wage benefits practices were improper and could reasonably lead to a Claim being asserted against it; and (b) its response to the question above in the 2021 Policy application was incorrect.

38.     Twin City relied on Hawbaker's respective policy applications in assessing the risk and issuing the 2020 and 2021 Policies.

## C.      The Criminal Action

39.     On April 8, 2021, the Pennsylvania Attorney General filed the Criminal Action against Hawbaker, alleging that Hawbaker had stolen fringe benefit funds that were supposed to go into prevailing wage workers' pensions and to pay for prevailing wage workers' health and welfare benefits. A copy of the Criminal Complaint is attached as Exhibit C.

40.     Specifically, the Criminal Action Complaint alleges that Hawbaker "stole $20,696,453 in fringe benefit funds from prevailing wage workers between September 1, 2015 and December 31, 2018 and used that money to pay for all [Hawbaker] benefits and otherwise to lower the company's costs. [Hawbaker] was required to use that money for the sole benefit of the prevailing wage workers who earned the money, but it failed to do so. Therefore, there is probable cause, for each

year between 2015 and 2018, that [Hawbaker] committed the crime of Theft by Failure to Make Required Disposition of Funds Received."  (Ex. C, p. 21 of 32.)

41.    On August 2, 2021, Hawbaker entered into a Plea Agreement with the Office of Attorney General.  A copy of the Plea Agreement is attached as Exhibit D.

42.    Under the Plea Agreement, Hawbaker agreed to plead no contest to four counts of Theft by Failure to Make Required Disposition of Funds Received, 18 Pa.C.S. § 3927(a), based on "conduct in the years 2015-18."  (Ex. D., p. 1 of 4.)

43.    As part of the Plea Agreement, Hawbaker was sentenced to serve a concurrent five-year term of probation on each count and to "pay restitution for the charged period in the amount of $20,696,453.00 to affected victims." (*Id.* at p. 3 of 4.)

44.    The Plea Agreement provides Hawbaker "will issue the payments directly to the affected victims, under the supervision of the Corporate Monitor," and that "restitution may be paid in cash or in the form of retirement account contributions" within 120 days of sentencing. (*Id.*)  Hawbaker was also sentenced to reimburse the Office of Attorney General for $240,562.78 for "third-party expert fees incurred as costs of prosecution within 120 days of sentencing." (*Id.*)

**D.**    **The King Class Action**

45.    On May 6, 2021, Plaintiff James King, on behalf of himself and all others similarly situated, initiated the King Class Action. A copy of the King Class Action Complaint is attached as Exhibit E.

46.    According to the King Class Action Complaint, Hawbaker engaged in a "systematic and clandestine scheme of wage abuse and wage and benefit shortages," which involved "failing to pay prevailing wages to hourly employees working on prevailing wage projects by misrepresenting and misreporting the amounts paid" for "various wage benefits." (Ex. E, ¶ 1.)

47.    The Complaint further alleges that Hawbaker "designed, implemented and maintained this clandestine scheme from at least 2015 through and including 2018," before the scheme was "finally disclosed publicly on April 8, 2021." (*Id.*)

48.    The King Class Action sets forth causes of action for: (1) breach of contract: failure to pay timely all wages and benefits earned; (2) continuing breach of contract: misappropriated retirement accounts; (3) violation of the Wage Payment and Collection Law; (4) restitution; and (5) unjust enrichment.  (*Id.* at Counts I through V.)

**E.**    **The Packer Class Action**

49.    On October 13, 2021, Plaintiffs Lester Packer, Sr., Lester Packer II, and Shawn Dyroff, individually and on behalf of the Glenn O. Hawbaker, Inc. Benefit

Plan, initiated the Packer Class Action against Hawbaker, the Board of Directors of Hawbaker, the Plan Administrator of the Glenn O. Hawbaker, Inc. Benefit Plan, and John Does 1-20. A copy of the Packer Class Action Complaint is attached as Exhibit F.

50.     The Packer Class Action Complaint alleges that the defendants breached certain fiduciary duties by, among other things, failing to make required contributions to Hawbaker's 401(k) retirement savings plan and other employee benefits plans covered under ERISA. (*See* Ex. F.)

51.     The Packer Class Action plaintiffs allege the following two counts: (a) Count I: breaches of fiduciary duties of loyalty and prudence, as against Hawbaker and the Plan Administrator; and (b) Count II: failure to adequately monitor other fiduciaries, as against Hawbaker and the Board. (*Id.* at Counts I and II.)

52.     Count I alleges that Hawbaker and the Plan Administrator breached their fiduciary duties by failing to make required contributions to plaintiffs' individual 401(k) accounts within the appropriate time frame and in the appropriate amounts. (*Id.* at Count I.)

53.     Count II alleges that Hawbaker and the Board breached their fiduciary duties by failing to monitor the processes by which Plan contributions were made to participant accounts. (*Id.* at Count II.)

- 19 -

54.     The Packer Class Action plaintiffs seek an order requiring the defendants to restore all of defendants' profits to the plan and to disgorge all profits received from the Plan. (*Id.*)

**E.     The Coverage Dispute**

55.     Hawbaker provided notice of the Criminal Action on or about April 16, 2021; notice of the King Class Action on or about May 19, 2021; and notice of the Packer Class Action on or about October 14, 2021, and sought coverage for each action under the 2021 Policy.

56.     Twin City issued reservation of rights letters to Hawbaker with respect to each notice, advising that, based on the information then available, there was no coverage for any of these claims, all of which appear to be interrelated, as defined under the 2021 Policy.

57.     Upon information and belief, Hawbaker was aware prior to the inception of the 2021 Policy that it was being investigated for improper wage practices, that its wage and Plan administration practices were improper, and that the investigation and wage and Plan administration practices were reasonably likely to lead to a Claim. For example, as explained above, (a) the Search Warrant was executed on Hawbaker in June of 2018; (b) the alleged underfunding of the benefit plans – which is alleged to have been done knowingly and intentionally by Hawbaker and Hawbaker's executive-level personnel – occurred between

September of 2015 through December of 2018; (c) in June 2019, Hawbaker retained a consultant and subsequently changed the way that it handled payment of prevailing wage fringe benefit funds; and (d) according to the Commonwealth, Hawbaker admitted prior to early April 2021 that it had improperly used prevailing wage benefit funds to pay for general employee, executive, and owner benefits.

58.    The 2021 Policy does not provide coverage for any loss that is not fortuitous or that either has already taken place or is in progress, as is the case here. Further, there is no coverage under Common Terms and Conditions Section XVI where the Application contains misrepresentations, as is the case here.

59.    The Plea Agreement expressly states that Hawbaker is to pay $20,696,453.00 as "restitution" "to affected victims," and the civil plaintiffs in the underlying class actions seek restitution as damages and the return of improperly withheld funds and benefits, including by alleging that Hawbaker failed to timely pay all wages and benefits to employees under the Prevailing Wage Act and Davis-Bacon Act and misappropriated and underfunded employee benefit plans. The plaintiffs to the underlying civil actions seek return of improperly withheld funds and/or benefits.

60.    The 2021 Policy does not provide coverage for restitution or disgorgement.

61.    The underlying Packer and King Class Actions allege that Hawbaker deliberately engaged in a fraudulent scheme of wage abuse, which allegations remain pending. The Packer Class Action plaintiffs also allege that Hawbaker failed to timely pay all wages and benefits due to employees under the Prevailing Wage Act and Davis-Bacon Act, misappropriated and underfunded employee benefit plans, and committed violations of ERISA.

62.    Coverage for the underlying lawsuits is also barred in whole or in part by Exclusion III(A)(6) of the Fiduciary Liability Coverage Part, which provides, in part, that Twin City shall not pay Loss in connection with any Claim based upon, arising from, or in any way related to any: (a) claims for unpaid wages; (b) actual or alleged violation of the Equal Pay Act, Worker Adjustment and Retraining Notification Act, or any rule or regulation promulgated thereunder, or similar federal, state, local or common laws, rules or regulations; or (c) Wage and Hour Violation.

63.    To the extent that a final adjudication already has or later does occur, coverage for the underlying lawsuits may further be barred, in whole or in part, by Exclusion III(B)(7) of the Fiduciary Liability Coverage Part, which provides that Twin City shall not pay Loss of an Insured, based upon, arising from, or in any way related to the gaining of any personal profit, remuneration, or financial advantage to

which such insured is not legally entitled if a judgment or other non-appealable final adjudication in the underlying action establishes that such a gain did occur.

64.     To the extent that a final adjudication already has occurred or later does occur, coverage for the underlying lawsuits may further be barred, in whole or in part, by Exclusion III(B)(8) of the Fiduciary Liability Coverage Part, which provides that Twin City shall not pay Loss of an Insured based upon, arising from, or in any way related to any criminal or deliberately fraudulent act or omission, or any willful violation of law by such Insured if a judgment or other non-appealable final adjudication in the underlying action establishes such an act, omission or violation; provided, however, that this exclusion shall only apply to Insured Entities if a past or present chief executive officer, chief financial officer, general counsel, or any position equivalent to the foregoing of the Named Entity committed such an act, omission, or willful violation.

65.     Coverage for the underlying lawsuits may also be barred, in whole or in part, by Exclusions III(B) of the Employment Practices Coverage Part, which provides, in part, that Twin City shall not pay Loss in connection with any Claim based upon, arising from, or in any way related to: (1) any claims for unpaid wages; (2) any actual or alleged violation of ERISA, or any similar law; or (3) any Wage and Hour Violation.

66.    Coverage for the underlying lawsuits may further be barred by Exclusion III(C) of the Employment Practices Coverage Part, which provides that Twin City shall not pay Loss in connection with any Claim based upon, arising from, or in any way related to liability incurred for breach of any oral, written, or implied employment contract; provided, however, that this exclusion shall not apply to liability that would have been incurred in the absence of such contract nor shall it apply to the portion of Loss representing Defense Costs incurred to defend against such liability.

67.    Hawbaker disputes that there is no coverage and continues to assert that there is coverage under the 2021 Policy, prompting Twin City to file this action.

## COUNT I: DECLARATORY JUDGMENT

68.    Twin City re-alleges and incorporates by reference each of the allegations set forth above.

69.    This is a claim for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

70.    There is no coverage for any of the three underlying actions under the 2021 Policy for the reasons discussed above. Further, to the extent Hawbaker contends that there should be coverage under the 2020 Policy, there is no coverage under that Policy for similar reasons.

71.    An actual and justiciable controversy has arisen between the parties to this action regarding the parties' respective rights, duties, and obligations under the 2021 Policy.

72.    Twin City is entitled to a judicial declaration that there is no coverage for any of the three underlying lawsuits or related defense costs under the 2021 Policy.

73.    To the extent Hawbaker seeks coverage under the 2020 Policy, an actual and justiciable controversy has arisen between the parties to this action regarding the parties' respective rights, duties, and obligations under the 2020 Policy. Twin City seeks a judicial declaration that there is no coverage under that Policy as well.

**WHEREFORE**, Twin City respectfully respects that this Court:

(a) Issue declaratory judgment in favor of Twin City, declaring that Twin City has no duty to provide any coverage in connection with the underlying actions;

(b) Award Twin City its costs incurred in this action; and

(c) Grant such other and further relief as may be necessary and appropriate under the circumstances, including all other relief available at law or in equity to which Twin City may be entitled and to which this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Twin City demands a trial by jury on all issues so triable.

Dated:          September 21, 2022

**HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER**

By:      */s/ Ronald P. Schiller*
Ronald P. Schiller
rschiller@hangley.com
Robert L. Ebby
rebby@hangley.com
Marianne Bradley
mbradley@hangley.com
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200 (telephone)
(215) 568-0300 (facsimile)

*Attorneys for Plaintiff Twin City Fire
Insurance Co.*
